JOHN W. VAN HORN AND JOAN M. VAN HORN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Horn v. Commissioner
Docket No. 16401-82.
United States Tax Court
T.C. Memo 1983-693; 1983 Tax Ct. Memo LEXIS 91; 47 T.C.M. (CCH) 380; T.C.M. (RIA) 83693; November 23, 1983. John J. Vassen and Patrick B. Mathis, for the petitioners. Michael J. Cooper and James A. Kutten, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: This case was assigned to and heard by Special Trial Judge John J. Pajak pursuant to the provisions of section 7456(c) of the Internal Revenue Code *92 [1] and Rules 180 and 181. [2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: Respondent determined a deficiency in petitioner's 1980 Federal income tax in the amount of $1,693.00. After a concession by petitioners, the sole issue for decision is whether under section 162(a) petitioners are entitled to deduct petitioner-husband's costs of traveling between his residence and place of work. [3]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. *93 Petitioners, husband and wife, resided in St. Peters, Missouri, when their petition in this case was filed. Petitioner John W. Van Horn (petitioner) is an insulator and a member of Local #1, International Association of Heat and Frost Insulators and Asbestos Workers (union). Prior to joining the union in 1979, petitioner had been classified as a "permit worker." As such, he was subject to being "bumped" from his job by union members seeking work. Petitioner was employed on several occasions by Daniel International Corporation (Daniel) as an insulator at the Callaway Nuclear Power Plant project (Callaway). Callaway is a major project being built by Union Electric Company (UEC). The site was located near Fulton, Missouri, approximately 85 miles from petitioners' residence in St. Peters, Missouri. Petitioner was first employed by Daniel in August 1976. After working for about one month, he was laid off pursuant to a "reduction of force." In September 1977, petitioner was rehired by Daniel and worked until February 1978, when he was laid off. The critical period in this case began on November 14, 1978, when petitioner was again rehired by Daniel. He worked until November 17, 1980. *94 On that date, petitioner was suspended without pay, due to an unfortunate incident involving his son, pending an investigation concerning certain UEC property. Petitioner ceased working for Daniel on that date, although he was not officially laid off by Daniel until May 1981. The original plan for Callaway was to build two nuclear powered generating units (Units 1 and 2). Daniel was the general contractor for the entire project, with the exception of the main cooling tower. Construction of Callaway began in late 1975 with ground breaking and site preparation work. At that time, Unit 1 was scheduled to be completed by October 1981 and Unit 2 by April 1983. Due to a number of unforeseen problems, the estimated completion dates were extended on several occasions. In 1978 the estimated completion date was October 1982 for Unit 1 and April 1987 for Unit 2. These revisions were generally made public by UEC through various press releases and news conferences. In 1981, plans for the construction of Unit 2 were cancelled. This had no effect on Unit 1's estimated completion date. At the time of trial, construction on Unit 1 had not been completed. A referendum, "Proposition *95 11", was defeated in Missouri on November 4, 1980. If successful, the referendum would have prevented the operation of a nuclear power plant within Missouri until a permanent disposal site for radioactive waste could be approved by the Federal government. Even if the proposition passed, UEC intended to continue construction at Callaway. The proposition had no effect on the construction of Unit 1 or on the estimated completion date of Unit 1. Insulators at the Callaway project were hired by Daniel pursuant to an agreement with the union. Based on work requirements, an employee of Daniel would prepare a manpower request for a certain number of workers. The necessary insulators would be supplied from the union's referral list. [4] The decision to lay off a particular insulator due to a reduction of force at Callaway was solely within the discretion of Daniel. *96 When petitioner was hired by Daniel in August 1976 and in September 1977, he was told the jobs would last about seven weeks and two months, respectively. In contrast, when petitioner was hired on November 14, 1978, he was given no indication of how long employment would be available other than that hopefully it would be for a while. At that time Unit 1 was less than 40 percent complete and did not reach near that stage of completion until about November 5, 1979. A worker, such as petitioner, was required to attend an orientation lecture about Callaway each time he was hired by Daniel. During the lecture, the worker was informed of the then estimated time of completion. During 1980, Daniel had a substantial need for insulators. In addition to significant amounts of work on temporary facilities, insulation work was required in buildings for which Daniel was responsible. Such work was not seasonal in nature. A person in petitioner's craft could reasonably expect to remain employed for as long as work remained available and he maintained a good work record. Although the number of insulators at Callaway fluctuated in 1980, [5] the prospects for continued employment for a good *97 worker were substantial throughout 1980. The parties introduced two joint exhibits containing figures showing the total number of insulators employed at Callaway, one apparently as of each given Tuesday and the other on a weekly basis. From the time petitioner was hired on November 14, 1978, both exhibits show a pattern of increasing need for insulators at the site until mid-August 1979 by which time a substantial number were employed. Thereafter, there were fluctuations in the upper ranges of total employment of insulators and on two short occasions there were drastic reductions in force of insulators due to work stoppages by other crafts. None of these fluctuations affected petitioner's employment nor his prospects of employment. Petitioner was continuously employed by Daniel for more than two years despite the fluctuations in the total employment figures. Daniel was obviously satisfied with his performance. Petitioner was promoted to foreman on April 24, 1979. *98 Petitioner was in the group of Daniel employees at Callaway who could expect to remain employed throughout 1980. Petitioner's employment at Callaway ended when he was suspended on November 17, 1980 pending the outcome of the investigation. Petitioners claimed an adjustment to income on their 1980 return for employee business expenses in the amount of $4,439.00. There is no dispute that this amount represents the costs incurred by petitioner in commuting by automobile between his residence and the Callaway site. Respondent disallowed the claimed adjustment in full. OPINION Petitioner contends that his automobile expenses are deductible under section 162(a). [6] Ordinarily, a taxpayer's cost of commuting between his residence and place of work is a nondeductible personal expense under section 262. See Turner v. Commissioner,56 T.C. 27 (1971), vacated and remanded on respondent's motion by an unpublished order (2d Cir. March 21, 1972). However, that issue is not before us. Instead, respondent has conceded that if petitioner's employment at Callaway was temporary, his autombile expenses are deductible.[7] Accordingly, we shall limit our consideration to the *99 temporary versus indefinite issue. Since we agree with respondent that petitioner's employment was indefinite, any conflict with Turner is mooted. See McCallister v. Commissioner,70 T.C. 505 (1978). Whether a job is temporary or indefinite is a question of fact to be determined from all of the facts and circumstances of the individual case. Frederick v. United States,603 F.2d 1292, 1296 (8th Cir. 1979); Cockrell v. Commissioner,321 F.2d 504 (8th Cir. 1963), affg. 38 T.C. 470 (1962). The burden of proof rests with petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). This Court considers employment to be temporary if it is ecpected to last for only a short period of time and not a substantial *100 or indefinite period. McCallister v. Commissioner,supra;Tucker v. Commissioner,55 T.C. 783 (1971). Employment which is originally temporary may become indefinite due to changed circumstances or with the passage of time. Norwood v. Commissioner,66 T.C. 467, 470 (1976); Kroll v. Commissioner,49 T.C. 557, 562 (1968). In Cockrell v. Commissioner,supra at 507, the Eighth Circuit, to which an appeal in this case would lie, adopted the following test: Where it appears probable that a taxpayer's employment outside the area of his regular abode will be for a "temporary" or "short" period of time, then his travel expenses are held to be deductible; conversely, if the prospects are that his work will continue for an "indefinite" or "intermediate" or "substantially long" period, then the deduction is disallowed. (Quoting Wright v. Hartsell,305 F.2d 221, 224 (9th Cir. 1962.) This test was restated in Frederick v. United States,supra.Although we view the tests of this Court and that of the Eighth Circuit as substantially the same, [8] we need not decide *101 that question. Either test leads us to the conclusion that petitioner's employment during 1980 was indefinite. Obviously, workers in petitioner's trade faced some risk of being temporarily laid off. This factor alone, however, does not make employment temporary. See Abbott v. Commissioner,T.C. Memo. 1981-424. Nor would temporary decreases in employment due to work stoppages make indefinite work temporary. Frederick v. United States.supra at 1296. Petitioner's pertinent period of employment with Daniel began on November 14, 1978. Almost a year latter, construction on Unit 1 had not reached the 40 percent stage of completion. The estimated completion date for Unit 1 was about four years away. By the beginning of the year in question, petitioner had become a union member, had been promoted to foreman, and had been continuously employed at Callaway for over 13 months. There remained a substantial amount of work to be completed. Daniel continued to have a significant need for *102 insulators throughout 1980. In fact, except for two brief periods, when work stoppages by other crafts drastically reduced demand, the number of insulators employed at Callaway remained substantial throughout that year and into the next. We also observe that petitioner remained employed even during those two brief periods. As the Eighth Circuit said in Frederick v. United States,supra at 1295: "The relevant fact is the taxpayer's prospects for continued employment." Applying that test here, we find that by the beginning of 1980 petitioner's prospects for continued employment at Callaway for an indefinite period were excellent. Given the magnitude of the project and the demand for workers with petitioner's skills, it would have been unreasonable for petitioner to have concluded otherwise. See Hassebrock v. Commissioner,T.C. Memo. 1983-255; Portillo v. Commissioner,T.C. Memo. 1982-518. In Frederick v. Commissioner,supra, the Eighth Circuit upheld as not clearly erroneous the District Court's finding that the taxpayer's employment was temporary. Petitioner seeks to rely on Frederick but the facts *103 in Frederick are distinguishable from those in this case. In Frederick, the taxpayer was employed as a carpenter at the construction site of a large anti-ballistic missile project in North Dakota. During the time he was working, the Strategic Arms Limitation Talks were being conducted. If the talks were successful, plans to complete the project would have been cancelled. Petitioner contends that the existence of Proposition 11 placed him in a similar position. We do not agree. If successful, Proposition 11 would have prohibited the operation of nuclear plants in Missouri only until a permanent disposal site for radioactive waste was approved by the Federal government, not the construction of such plants. UEC intended to continue construction even if the proposition passed. This fact alone is sufficient to distinguish the instant case from the facts in Frederick.
We note additionally that in Frederick, the taxpayer's work was extremely seasonal with substantial layoffs common during the harsh and lengthly North Dakota winters, Petitioner on the other hand could anticipate working all year, as the did until he was suspended. By further contrast to the situation *104 in Frederick, Daniel's demand for insulators was substantial throughout 1980. In the event of a layoff at Callaway a worker for Daniel with a good record had a good chance of being rehired. Moreover petitioner's own prospects for continued employment were excellent and were cut short only by the unfortunate incident. Thus we believe that the facts in Frederick are clearly distinguishable on several grounds. Petitioner also makes the argument that under the circumstances of this construction job it was reasonable not to move closer to Callaway. This "reasonableness" argument has been rejected heretofore as improperly focusing on the taxpayer's particular living conditions. Frederick v. Commissioner,supra;Kasun v. United States,671 F.2d 1059 (7th Cir. 1982). We likewise reject this argument based on the rationale of those cases. We have carefully reviewed each of petitioner's other arguments. Unfortunately for petitioner, these arguments do not change our conclusion. Based on a review of the entire record, we find that petitioner's employment during 1980 was indefinite and not temporary. Accordingly, respondent's disallowance *105 of the claimed automobile expense must be sustained. [9]
Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect during the taxable year in issue, unless otherwise indicated. All references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
2. Pursuant to the order of assignment, on the authority of the "otherwise provided" language of Rule 182, the post-trial procedures set forth in that rule are not applicable in this case.↩
3. This case was consolidated for trial with four other cases with respect to common witnesses and for briefing with two of these four cases.↩
4. During the period 1976 through 1981, the union found that its members were almost all fully employed in various projects within its jurisdiction, causing it to allow permit workers to satisfy the demands of various employers. The number of union insulators employed during that period ranged from 298 to 320. The number of insulators employed as permit workers ranged from 241 to 370.↩
5. Fluctuations were the result of various factors such as voluntary quits, no-shows, firing due to violation of project rules, reductions in force due to the needs of the employer, and work stoppages by other crafts.↩
6. Section 162 provides in pertinent part: (a) IN GENERAL.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ↩
7. An explanation of respondent's position is set forth in 2 Stand. Fed. Tax Rept. (CCH) para. 1352.144 (1983); see also, Fed. Taxes (P-H) para. 11,426 (1983).↩
8. See Brown v. Commissioner,T.C. Memo. 1983-217↩ and the cases cited therein concerning the test set forth by the Court of Appeals for the Ninth Circuit.
9. The expenses in issue are deductible only under section 162(a). Frederick v. Commissioner,603 F.2d 1292, 1295, Fn. 5 (8th Cir. 1979).That is because section 162(a)(2) does not apply to trips that do not require rest or sleep. United States v. Correll,389 U.S. 299↩ (1967).